MICHEL
*v.*
BEALE.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

UNION BANK OF LOUISIANA *v.* JOHN C. BEATTY, et als.

| 10 | 361 |
| 109 | 93 |
| 109 | 95 |

*Marchais* had been cashier of plaintiff's branch bank at Thibodaux, and had embezzled the funds of the branch. To conceal his embezzlements he bought from the plaintiff the banking-house and assets of the branch, the assets being described in the bill of sale in accordance with a list of them furnished by *Marchais* himself, which list was false and comprised various bonds, bills and notes that did not exist. *Marchais* gave notes for the price, with the defendants as his solidary sureties, the latter, as well as the plaintiff, being ignorant of the fraud of *Marchais*. Held :

That to hold the sureties liable on the notes would be making them responsible, not for an obligation arising out of the contract of sale from plaintiff to *Marchais*, but for a loss sustained by plaintiff before that contract was made.

That defendants, though only sureties, for the performance of the principal obligation, were parties to the contract of their principal with the bank; and that the bank warranted to the sureties the existence of the thing sold.

That the sale was valid as regards the principal obligor, he not being permitted to set up his own fraud; but that, as regard the sureties, there was no sale and thus no principal obligation; and consequently no accessory one.

APPEAL from the Fifth District Court, Parish of Lafourche, *Randall*, J. *C. A. Johnson* and *George Eustis*, for plaintiff and appellant. *J. C. & A. Beatty*, and *Benjamin & Micou*, for defendants.

46

The following printed arguments were filed:

*C. A. Johnson*, for plaintiff:

"The plea of error presents itself next."

"We hold to the ground assumed in the bill of exceptions. If this means of defence could not avail *Marchais*, no more can it avail the sureties. This seems to follow from what is inherent in the very nature of the contract of suretyship. Suretyship in an accessory obligation, and thus pre-supposes a principal one on which it depends. The question then is, does the principal obligation subsist? It certainly does, unless the obligor, in such principal obligation, can avoid it. Would a plea of error avail *Marchais*? If not, then the principal obligation subsists, and the surety is bound, unless released, not by causes inherent in the original contract, but by causes independent of that, and affecting solely his collateral undertaking, such as fraud practiced by the creditor to bring about the collateral undertaking, or error produced by the creditor, without which the collateral liability would not have been assumed. For it must not be lost sight of that the principal contract is one thing, and the accessory contract another, notwithstanding the effect of the latter, when completed, may be to bring upon the surety all the obligations pertaining to the principal.

"The Bank," says the brief of defendants, "either knew or was ignorant that it did not own the obligations that it professed to sell. If it knew it, there was fraud on its part towards the securities, and this fraud annuls the contract.

If it believed that it owned these obligations, then the Bank and securities were both in error, and come strictly within the definition of the Code. (Art. 1815.)"

If this means anything, it means that there was error in the matter of defendant's contract. But this seems to us to be a non sequitur. It assumes the point in dispute, to-wit: that the object and cause of the collateral undertaking were the same as those of the principal contract. But suretyship is a unilateral contract, in which the creditor binds himself to nothing. Troplong, Cautionnement, 18.

There was a consideration moving from the bank to *Marchais* in the principal contract, but there was none moving from the bank to the defendants in the collateral contract, and it is with the latter, and the latter only, that we are now dealing. The object and matter of it is solely and exclusively to guarantee the performance of the principal obligation. "Il n'a qu'un but, c'est de procurer au créancier une sûreté. La seule obligation qui se contracte est donc celle du fidéjusseur. Le créancier ne s'engage à rien, et, dès lors, le contrat est unilatéral." Troplong, loc. cit.

We repeat it, to come to a conclusion upon the alleged error of the defendants, and its effect upon their engagement, the true inquiry must be, not what was the matter, object or motive of the contract of *Marchais* with the bank, but, what were the matter, object and motive of the collateral undertaking, by which, when the contract of *Marchais* had once been closed, and the principal obligation had attached to him, the defendants stepped forward and said, we take upon ourselves the obligation of *Marchais*, and make it ours. The rules as to error, and its effects on contracts, contained in Art. 1815, cited and relied on in the extract above given, as well as in the following articles, are to be applied to the principal contract and to the collateral one, as two separate and independant contracts, which they really are. Troplong, ibid 19.

C. C. Art. 1815. "That is called error of fact, which proceeds either from ignorance of that which really exists, or from a mistaken belief in the existence of that which has none."

1817. "Errors may exist as to all the circumstances and facts which relate to a contract; but it is not every error that will invalidate it. To have that effect, the error must be in some point which was a principal cause for making the contract, and it may be either as to the motive for making the contract, to the person with whom it is made, or to the subject matter of the contract itself."

Applying, then, these articles first to the principal contract, it cannot be pretended that *Marchais* could find in them any relief from his obligation. Let us see what results from their application to the contract of the defendants.

The error invoked to invalidate a contract, must, according to Art. 1817, bear either upon the motive for making it, the person with whom it is made, or the subject matter of the contract itself."

Leaving out of view the person, as without the limits of the controversy, we say that the subject matter of the collateral contract, was the joining of the faith of the defendants to that of *Marchais*, for the performance of the principal obligation. This results from the very definition of the contract; C. C. 3004; Code Nap. 2011; Troplong, ib. 1; and that the motive of it was to procure to the creditor this additional security, without which credit would not have been given to the principal. Troplong, ib. 18.

The argument of the defendants would make the cause of the principal obligation, which was the acquisition of the property of the bank, the cause or motive of their collateral contract, and therein consists the fallacy; for the collateral undertaking, as a unilateral contract, did not admit of it. It is converting the unilateral into a bi-lateral and commutative contract, and thus changing its very nature.

The true cause or motive, as we have already said, was to procure to the creditor the additional security, without which credit would not have been given to the principal, and it cannot be pretended that there was error in respect of this.

"V.—Le quatrième et dernier élément nécessaire, c'est une cause licite de l'obligation. Nous avons eu déjà l'occasion de dire qu'il ne faut pas entendre par *cause de l'obligation*, dans le langage du droit, ce qu'on appellerait la cause du contrat, ou même aussi, la cause de l'obligation, dans le langage ordinaire---Quand je vous vends ma ferme, la cause du contrat, ou de mon obligation si l'on veut, le motif qui m'a déterminé à m'engager, ce sera tantôt la nécessité où je me trouve de payer des sommes considérables, tantôt le projet d'acquérir des rentes ou des maisons en remplacement de mes terres, afin d'augmenter mon revenu, tantôt de doter ma fille. Mais, en droit, ces motifs premiers ne sont pas à considérer; et c'est seulement le motif dernier et immédiat de l'obligation qui constitue sa cause juridique : quand je m'oblige à vous livrer ma ferme, mon motif immédiat, la cause juridique de mon obligation, c'est l'obligation que vous-même contractez de me payer une somme d'argent, quel que soit l'emploi auquel je destine cette somme. De même, quand je consens à vous livrer ma maison de Paris, en échange de votre terrain d'Auteuil, il importe peu que je me propose de faire de ce terrain un vignoble, ou d'y construire une maison de plaisance que j'habiterai, ou d'y élever une construction propre à recevoir des locataires : peu importent, enfin, les motifs qui m'ont fait agir; dans tous les cas, c'est uniquement l'obligation que vous prenez de me livrer ce terrain qui forme la cause de mon obligation de vous livrer ma maison.

Dans les contrats synallagmatiques, c'est toujours l'obligation d'une partie qui est la cause de l'obligation de l'autre : la cause de chaque obligation est alors le désir d'obtenir ce que fait *l'objet* de l'autre obligation.—Quand le contrat est unilatéral, qu'une seule obligation est contractée, l'obligation, si elle est néanmoins à titre onéreux, trouve sa cause dans l'obtention de l'avantage quelconque procuré par l'autre partie; que si cette obligation unique est prise gratuitement, sa cause est dans le désir d'une partie de rendre service à l'autre.

La loi ne demande pas que la cause première qui, en fait, a déterminé la partie à contracter ait tel ou tel caractère, elle ne s'en occupe pas : c'est seulement dans la cause immédiate de l'obligation qu'elle exige qu'il n'y ait rien d'illicite. Ainsi quand je m'oblige à vous livrer mon champ pour une somme de 10,000 fr. que je me procure dans l'unique but de faire commettre un crime, mon obligation envers vous n'en est pas moins valable et je ne pourrais pas refuser de vous livrer le champ que je vous ai vendu. Mais quand je promettrai ensuite à Pierre de lui payer les 10,000 fr. pour prix du crime qu'il me promet d'accomplir, c'est alors que mon obligation sera nulle pour défaut de cause licite, comme la sienne le serait pour défaut d'objet licite; et aucun de nous ne pourrait contraindre l'autre à l'exécution."—*Marcadé, Vol. 4, p. 347. V.*

The argument of the defendants, contained in the extract from their brief, above given, and based upon Art. 1815, is not sustained, and a true application of the law relating to error, to the contract of defendants, leaves their obligations in all their force.

Defendants, still stepping beyond their contract, and its inherent limitations and conditions, say it is apparent that the motive of that contract was their belief in the existence of the assets. We search the record in vain for anything to countenance this naked averment of the defence; but, admitting it to be true as a fact, and waiving, for the moment, the question which would be so pertinent in this case, as to who had produced and who must suffer for that

UNION BANK
?.
BEATTY.
erroneous belief, as a motive, it is of that class which, in the language of Marcadé, above cited, "ne sont pas a considérer en droit." It is not " ce motif dernier et inmédiat de l'obligation qui constitue sa cause juridique." The "cause juridique," on the contrary, as we have seen above, consisted in the additional security furnished to the creditor, without which, credit would not have been given to the principal. See, also, Marcadé, vol. 4, p. 351 ; I. Commentaire de l'Art. 1110 du Code Nap.

Indeed, the argument of the defendant amounts to this, that they were to be liable, only in case *Marchais* should prove to be an honest man and his representations as to the assets prove true. If such an argument were admissible, it is clear that suretyship would be but an illusion, and the act of the surety, by which his faith is added to that of the principal, would amount to the grossest of deceptions.

To our position that the defendants could avail themselves of no defenses from which *Marchais* was precluded, their brief replies that our proposition cannot be true, for if it were, then a security could not plead his minority when he contracted, nor an unauthorized married woman her incapacity, nor could compensation be opposed for a debt due the surety by the creditor. The defendants' argument mistakes our position and his own. When we say the surety can plead no defenses from which the principal is precluded, we must be understood to mean defenses affecting the principal obligation, since if they are not of that nature, the principal obligation is intact and subsists, whence we deduce, as an inevitable corollary, the continuance of the collateral liability, it being understood, of course, that the collateral contract must not be vicious for causes peculiar to itself. But it so happens that all the cases put by the defendants are precisely in this latter category. The two first are cases of persons not *sui juris*. There was no collateral contract as to them, for they were unable to contract at all. In the remaining case, compensation is a mode of extinquishing the debt to which it is opposed, and implies its existence and validity as against the surety pleading the compensation ; it is obvious that his liability, when once fixed, can be extinguished like that of any other debtor.

Again, says the defendant's brief, suppose the bank had known all the facts as to the embezzlement of the funds of the branch, *Marchais*, it is admitted, could not have not set up this knowledge against the plaintiff, but, it is pointedly asked, could not the securities ? We may safely answer this question in the affirmative, but the obvious reason is, that the suppression of such knowledge on the part of the bank, would have been a fraud on the sureties themselves, vitiating their own collateral undertaking as a separate and independant contract. The release would flow not from anything inherent in the principal contract, but from an original vice in the contract of suretyship itself.

We quote the defendants brief again : "Art. 3029 of the Civil Code, authorizes the surety to oppose all the objections inherent in the debt, which the principal might oppose, but it does not preclude him from opposing those which the debtor might be stopped from presenting. There is, at all events, nothing in our law to make contracts here an exception to those made elsewhere."

This article is the corollary of the principle embodied in Art. 3006, to-wit : that the suretyship cannot exceed what may be due by the debtor, nor be contracted under more onerous conditions. Its enunciation was, indeed, unnecessary, except for the sake of declaring the restriction contained in it ; the objections which are common to the principal and his surety being limited to those which are inherent in the debt as contradistinguished from personal exceptions on the part of the principal, such as minority or coverture, which had already been denied to the surety by Art. 3005. But, say the defendants, the article does not preclude the surety from opposing objections which the principal would be estopped from presenting.

It would have been strange, indeed, if it had done so, for this would have been to subvert the principle upon which the whole doctrine of surety reposes. For the argument of the defendants assumes that the exception shall be one which could not avail the principal. It follows, then, that the latter remains bound. How, then, can the surety be released, since the very essence of his contract consists in this ; that he has lent himself to the performance of whatever the principal is bound to perform. In the language of *Troplong*, " L'obligation du fidéjusseur n'est que l'obligation principale elle-même, étendue jusqu'à lui." " Le fidéjusseur doit ce que le débiteur principal doit." " *In aliam rem fide jussor obtigari non potest.*"

"Et par là, on arrive tout de suite à une conséquence que les textes cités ont déja fait pressentir: c'est que l'exception ne profite au fid'jusseur qu'autant qu'elle est inhérente à l'obligation même; *rei cohærentes exceptiones.*" Troplong Cautionnement, 46, 48, 510, 511, 512.

These views are fully sustained by our own jurisprudence, as will be seen in the cases of *Villerè* v. *Armstrong*, 4 N. S. 21, and *Mayor* v. *Blache*, 6 L. R. 500.

A few words of comment upon the authority mainly relied on by the defendants, to wit: the opinion of the Lord Chancellor, in the case of *Owen* v. *Homan.*

In the first place, nothing is decided in the case cited, as to the merits, the matter being before the court on an application for an interlocutory decree. The analogy there declared to exist between the contract of suretyship and that of insurance is based upon the supposition that communication had taken place between the creditor and the surety respecting the liability to be assumed by the latter. The analogy fails in the case in hand, there never having been any such communication between plaintiff and the defendants. To show how little effect should be given at best to any such partial analogy, we cannot do better than to quote from Troplong, a passage in which, while noticing, himself, the resemblances of the two contracts under consideration, he sets forth the points in which they essentially differ:

"35. Le cautionnement a quelque rapport avec l'assurance : 1o. en ce que le fidéjusseur se soumet à une chance périlleuse et incertaine qui rappoche l'agissement des contrats aléatoires; 2o. en ce que le creancier qui exige un cautionnement veut s'assurer contre le péril du non-remboursement par le débiteur.

Néanmoins, le cautionnemen' diffère de l'assurance par des côtés remarquables. Le cautionnement est un contrat unilatéral ; l'assurance est un contrat synallagmatique. Le cautionnement est un contrat accessoire ; l'assurance est un contrat principal. Le cautionnement est un contrat intéressé de part et d'autre qui le rappoche de la vente.

36. D'où dérivent ces différences ? A quelle cause première peut-on les rattacher? Elles proviennent de ce que, dans le cautionnement, le créancier ne paie pas la sûreté qu'il se procure pour ce qui lui est dû, et que cette sûreté lui est donnée comme condition du crédit qu'il fait au débiteur.

Mais introduisez dans le cautionnement un élément qui est hors de son essence, c'est-à-dire un prix payable par le créancier, et vouz aurez à l'instant un contrat d'assurance proprement dit; contrat aussi different du cautionnement que le prêt simple diffère du prêt à intérêt.

Voyez, en effet, les conséquences de l'introduction dans le cautionnement d'un prix payé par le créancier. A l'instant, le contrat intervenu entre le créancier et celui qui l'assure se détache du contrat primitif dont on redoute la non-exécution, et l'assureur et l'assuré traitent d'une manière principale d'un objet entièrement distinct, à savoir, d'un risque à courir."

We come next to the question of subrogation.

The defendants argue that they are discharged under Article 3030 of the Civil Code, which reads thus:

"The surety is discharged when, by the act of the creditor, the subrogation to his rights, mortgages and privileges, can no longer be operated in favor of the 'surety.'"

If the charges of fraud and error had been sustained there might be room for the application of the law cited, for it might then be argued that the power to subrogate had failed by the act of the creditor, but we have already seen that those charges are unsupported, and we are at a loss to understand by what reasoning the plaintiffs could be held to transfer any other rights than they themselves possessed. This court has decided that the negligence of the creditor, in the preservation of privileges that had actually existed, did not discharge the surety. *Parker* v. *Alexander*, 2 An. Rep. 189. To produce that effect, the creditor must do some act by which the subrogation can no longer be operated in favor of the surety. If the subrogation is impossible in the present case, it is not due to any act of the plaintiffs but to the fraud of *Marchais.*

*George Eustis, Sen.*, for plaintiff:

The contract of suretyship is one of those which the Code has taken upon itself to define and regulate.

It is obvious that the jurisprudence of England and of the States is entirely foreign to it. The obligations which it implies are fixed by legislation, which embodies the views of Pothier and of the civilians.

UNION BANK
   *v.*
 BEATTY.

"Suretyship is an accessory promise, by which a person binds himself for another already bound and agrees with the creditor to satisfy the obligation if the debtor does not." (Code, 3,004.)

There is something singular in this definition. It is not that of Pothier nor of the Napoleon Code :

"Le cautionnement est un contrat par lequel quelqu'un s'oblige pour un débiteur envers le créancier, à lui payer en tout ou en partie ce que ce débiteur lui doit, en accédant à son obligation." Pothier, Ob. 366.

"Celui qui se rend caution d'une obligation, se soumet envers le créancier à satisfaire à cette obligation, si le débiteur n'y satisfait pas lui même." (Code Nap. 2011.)

In the definition of the Louisiana Code, suretyship is not called a contract but a promise. The French text is in the same sense, and it seems clear that this definition is the result of a careful consideration of the subject.

So the Partidas, 5, 12, 1 :

"By security ( *fiador*) is meant he who pledges his faith, at the command or request of him who gives him as security, to give or to perform something for another person."

Suretyship is nevertheless a contract, but it is an unilateral contract. The creditor binds himself to nothing. The suretyship is a matter principally between the debtor and the surety, for the benefit of the creditor.

"Le cautionnement est cependant un contrat unilatéral, et la raison en est simple. Quel que soient les rapports particuliers qui existent entre le débiteur et celui qui le cautionne, comme ces rapports ne sont pas ce qui constitue le cautionnement, il ne faut pas les prendre en considération pour fixer le caractère de ce contrat. Le cautionnement, en effet, se passe principalement entre le créancier et celui qui s'oblige en qualité de fidéjusseur.

"Il n'a qu'un but, c'est de procurer au créancier une sûreté. La seule obligation qui se contracte est donc celle du fidéjusseur. Le créancier ne s'engage à rien, et dès lors, le contrat est unilatéral." Troplong, Cautionnement, 18.

"If one of the parties makes no express agreement on his part, the contract is called unilateral, even in cases where the law attaches certain obligations to his acceptance." Code, 1758.

Besides the contract between the surety and the creditor, the law supposes that the contract of mandate intervenes between the debtor and the surety, whenever the suretyship is undertaken with the knowledge of the debtor.

Thus Pothier, Oblig., 366.

"Le cautionnement, outre le contrat qui intervient entre la caution et le créancier envers qui la caution s'oblige, renferme aussi assez souvent un autre contrat, qui est censé intervenir, au moins tacitement, entre la caution et le débiteur, pour qui la caution s'oblige; et ce contrat est le contrat de mandat, qui est toujours censé intervenir, lorsque c'est au su et au gré du débiteur principal que la caution s'oblige pour lui."

And Troplong, 17, 28, 327 :

"Il est vrai que tout cautionnement renferme en soi un mandat, ainsi que nous l'avons dit ci-dessus (17.) Mais ce n'est pas du fidéjusseur au créancier qu'il y a mandat." "Le mandat n'existe que du débiteur principal à la caution."

II.    The contract of mandate thus intervening, it follows that the suretyship must be considered as having been contracted at the instance of the debtor, to which the creditor is not supposed to be privy.

"La caution qui paie fait, en payant, ses propres affaires, puisqu'elle se libère d'une obligation qu'elle a personnellement contractée. Mais la cause de cette obligation c'est un cautionnement, c'est à dire, un contrat qui l'oblige dans l'intérêt d'autrui. Il est donc juste que celui dans l'intérêt duquel elle a dû payer, l'indemnise, car elle a été son mandataire si elle l'a cautionné sur sa prière ou en sa présence, et son *negotiorum gestor* si elle l'a cautionné spontanément et à son insu." Ponsot, Cautionnement, 232.

"By security, ( *fiador*,) is meant he who pledges his faith at the command or request of him who gives him as security." Partida, 5, 12, 1.

"Debitoris mandato vel rogatu." Gregorio Lopez.

"Surety is one who engages or promises to another to give or do something by the order or at the request of the person on whose behalf he enters into security." Asso y Manuel, Institutes of the Civil Law of Spain. Johnston's translation, 243.

"As a cautioner binds himself at the desire of the principal debtor, he has an *actio mandati* against him." Erskine, Law of Scotland, 721.

III. The surety is presumed to know the condition of the debtor. *Sibi importet id.* Ponsot, 62. Troplong, 26.

IV. There is a distinction between the suretyship for the payment of a sum of money on a debt, and one for the performance of a fact, *ad factum prœstandum.* Erskine's Law of Scotland, 718, 719, and note.

The authorities quoted pre-suppose that in the former, the obligations of principal and surety are identical towards the creditor.

The authors referred to are considered the best who have treated on this subject, viz: Ponsot and Troplong. Rep. Gen. de Dalloz, *verbo* cautionnement.

If the doctrine of these authors is correct, the defendants have no case, and having none, they seek to embarrass the enquiry by referring to a complicated and artificial jurisprudence, having its origin in the absence of any sound and fixed rules on the subject of suretyship. Every one familiar with that jurisprudence knows this to be so.

*J. C. & A. Beatty,* for the defendants:

This evidence shows conclusively a large amount of the notes which the bank professed to sell, were not its property. The defendants believe it not necessary to prove the precise amount of deficit from the persuasion that they are released from all obligation to pay, by the partial failure of the consideration established; but if the court is of opinion that it is essential to show the precise amount of the deficit, the right is reserved to them, by agreement.

In proof of the fact that *Frey* and *Jacobs* acted without authority in selling to *Marchais*, and that no proper statement was ever furnished from the branch in Taibodeaux, they refer to the terms of the resolution of the bank, and the letter of *Frey*, their cashier, in which he expressly requires that the statement to be furnished by *Marchais*, should be signed and approved by the directors of the branch. The only statement of the 1st of February, 1850, produced, is one signed by *P. Marchais* himself.

The stipulation by the bank was for a statement by the branch. To this the defendants are parties, for they are expressly named in the resolution, and the bank were bound to require such statement from the proper officers of the branch. By the 34th section of their charter—which is in evidence—five or seven directors were required to be named annually to administer the affairs of the branches.

If the bank received then a statement not made in accordance with their own resolution, they had no right to sell under it, and receive the notes of the defendants: or, if they do so, must at least guarantee its correctness—and we have shown it to be erroneous to a great degree.

*P. Marchais*, by whom alone that statement is made, was their own officer, and, as between defendants and plaintiff his act is theirs—his fraud is theirs. The resolution authorized defendants to expect an honest and correct exhibition by the bank of what it was to sell, and for what they were to be responsible. If a fraudulent one has been made, and they have acted thereon it is their own fraud, committed by their own officer, and never communicated to defendants till after his bankruptcy, and they must suffer for it.

In the sale of *P. Marchais*, is found the following stipulation:

"It is further understood that, in consideration of this arrangement, the said *P. Marchais* engages to attend to the business of the branch bank at Thibodauxville, as also to any business which the Union Bank of Louisiana may have in the parishes of Lafourche Interior, Terrebonne and Assumption, without any charge for salary and commission."

No such stipulation is contained in the resolution, and this additional stipulation is the fact complained of in the amended answer.

The undersigned have endeavored to confine themselves, so far, to the facts, as much as possible, leaving the argument on the question resulting from these facts and the authorities, to follow.

The principal questions of law presented, are:

1st. The question of error or fraud.

2d. The obligation of the bank to warrant the existence of the obligations sold by it.

3d. The effect of the additional stipulation.

FRAUD AND ERROR.—C. C. Art. 1815. "That is called error of fact which

proceeds either from ignorance of that which really exists, or from a mistaken belief in the existence of that which has none."

The bank either knew, or was ignorant, that it did not own the notes and obligations it professed to sell. If it knew it, there was fraud on its part towards the securities, and this fraud annuls the contract. C. C., Art. 1841. If it believed that it owned these obligations, then the bank and securities were both in error, and come strictly within the definition above quoted from the Code.

All errors, however, do not vitiate contracts. There can, however, be no doubt in this case, that the motive which prompted the securities of *Marchais* to bind themselves, was the belief that he was buying assets sufficient to enable him to discharge the debt. The bank, if acting in error and not in fraud, believed themselves to be selling property to the value of $64,000 to *Marchais*, and sought to secure themselves payment of this price, and took security for it. They were both in error, and this error is such as vitiates the contract. See C. C., Arts. 1818 to 1821. The plaintiffs, however, though they cannot deny the existence of this error on their part or on the part of defendants, now seek to hold the defendants responsible, not for the future good faith and fidelity of *Marchais*—for which they bound themselves—but for his past infidelity and bad faith; an obligation which defendants never contracted; and in respect of this pretension, they rely on the fact that *Marchais* could not, if himself sued on his contract, set up that the bank was not, at the time of the sale, the owner of the bonds, notes and obligations it sold; but that he had previously embezzled their funds, and represented these notes, &c., as theirs, to avoid detection, and that defendants cannot avail themselves of any defence which *Marchais* himself could not plead.

Now to show that this allegation, in these general terms cannot be sustained, it is sufficient to say that if true, then, a security could not plead his own minority when he contracted; a married woman could not plead she was unauthorized—a surety could not plead in compensation a debt due to him by the creditor.

Again : suppose the bank had known all the facts in this case as they really exist, that is, that they had already been robbed—*Marchais* still could not have set up this knowledge to defeat their claim—cannot the securities?

C. C. 3029, authorizes the security specially to oppose all the objections inherent to the debt, which the principal might oppose ; but it does not preclude him from opposing others which the debtor might be estopped from presenting. There is at all events nothing in our law to make contracts here an exception to those made elsewhere. In the case of the *United States* v. *Boyd et al.*, 5 Howard, pp. 43 to 50, which was the case of the sureties of a receiver of public money to the United States, the plaintiffs claimed that the sureties were bound by their bond for past misconduct, as well as for future ; this was decided against them. They then contended that the receiver's accounts were conclusive against the sureties, and could not be contradicted by them. In relation to this point, the court says: "It has been contended that the returns of the receiver to the treasury department, after the execution of the bond, which admits the money to be then in his hands to the amount claimed, should be conclusive upon the sureties. We do not think so. The accounts rendered to the department, of money received, properly authenticated, are evidence, in the first instance, of the indebtedness of the officer against the sureties; but subject to explanation and contradiction. They are responsible for all the public moneys which were in his hands at the date of the bond, or that may have come into them afterwards, and not properly accounted for; but not for moneys which the officer may choose falsely to admit in his hands, in his account with the government.

"The sureties cannot be concluded by a fabricated account of their principal with his creditors; they may always inquire into the reality and truth of the transactions existing between them. The principle has been asserted and applied by this court in several cases."

The principle rejected by the court in that case is sought to be applied to the securities in this case.

In the case of *Farrar & Boyd* v. *The United States*, 5 Peters, 388, the court say :

" *Rector* was appointed surveyor, or at least commissioned as such on the 13th of June, 1823 ; and this bond bears date the 7th of August, 1823.

Between the 3d of March and the 4th of June in the same year, there had been paid to him from the treasury, the sum of money found by the jury ; so that it was paid to him before the commission and before the bond in proof. On this state of facts the bill of exceptions asserts three grounds of defence.

" 1st. That the sureties could not be made liable at all for the money paid.

" 2d. That if at all they ought to be let into proof that *Rector* had appropriated the money to his own use before the date of the bond, or

" 3d. That he had paid it, or enough of it, to cover the penalty of the bond to the use of the United States before they became bound for him.

" On these points we see no difficulty in affirming, that for any sums paid to *Rector* prior to the execution of the bond, there is but one ground on which the sureties could be held answerable to the United States, and that is on the assumption that he still held the money in bank, or otherwise. If still in his hands, he was up to that time, bailee to the government; but upon the contrary hypothesis, he has become a debtor or defaulter to the government, and his offence was already consumated. If intended to cover past dereliction, the bond should have been made retrospective in its language. The sureties have not undertaken against his past misconduct. They ought, therefore, to have been let into proof of the actual state of facts, so vitally important to their defence."

In both these cases the sureties had bound themselves that their principals should pay over the moneys of the United States, in their hands. In both cases, the officers had represented that they held certain moneys for the United States; but the sureties were in both cases permitted to show that they in realty had not such sums in their hands when they became bound for them ; for the avowed reason that if the money was not then in the hands of the officers—though it was represented by them, that they held it, and though they ought to have had it—the sureties were not liable.

In neither of these cases could the principal have plead that they were not in possession of the funds when they executed their obligations.

In the case of *Kepp* and another v. *Wiggett* and others, vol. 1, part 3, p. 365 of Little & Brown's English Reports, (Law Journal Reports, N. S. C. P. 49,) the Court of Common Pleas in England decided that though one *James Lee* and the defendants had executed a bond in which it was declared that said *Lee* had been duly nominated and appointed a collector for the year ending April 5th, 1847, and thereupon the said *Lee* proceeded to collect certain taxes in the district for which he was appointed, without having the proper authority to do so. The court decided that the securities were only liable for what he lawfully collected, and that they were not estopped by the recital in the bond from showing that he was not legally authorized to collect the sums for which they were sued, In this case the securities were direct parties to the bond, whereas, in the present case, our notes were delivered to *Marchais*, to be by him transferred to the Bank only when the terms of their own resolution were complied with, and his securities were not present nor cognizant of the statements made in the pretended sale, and yet it is contended that they are estopped.

The case of *Owen* v. *Homan*, volume 3, part 1, pages 119 to 121 of Little & Brown's English Reports, (15 Jurist. 339,) which is here quoted at length, goes, still further than any of those cited in support of the rights of sureties.

Chancellor Truro there assimilates the duty of the creditor towards the surety to that of the assured to the assuror, and declares that the creditor, when any communication takes place between himself and the securities, is bound to make the securities fully acquainted with all the circumstances affecting materially his liability in the contract he is about to enter into,—and expressly declares that there is no difference where the security is in the shape of notes of hand. In the present case this duty is still more incumbent on the plaintiffs, who were selling to their own officer the assets of the institution he had been himself managing for them. Good faith required that they should have accurately ascertained and correctly informed defendants of the real amount of assets they were selling. Their own resolution, accepting defendants as securities, imperatively demanded this of them.

[EXTRACT FROM DECISION IN *Owen* v. *Homan*.]

" The defendant also swears to her belief that the fraudulent conduct of *Bowers* took place in collusion with the plaintiffs. No particular facts are stated as,

UNION BANK
*v.*
BEATTY.

UNION BANK
*v.*
BEATTY.

the foundation of that belief, and it is most probably an inference which she draws from the circumstance of men of business receiving securities from an old lady in the way of suretyship, of such an amount, and during so long a time, and in relation to such a state of accounts as existed between them and the debtors, without ever making any communication to her, although known to them, and their managing clerk was in the habit of visiting her. Placing no reliance on the allegation of collusion, in the absence of specific facts being stated as a foundation for it, and attending only to such of the general facts as are undisputed, the equity on the part of the plaintiffs is not free from difficulty. Nothing turns upon the facts that the suretyship is created by promissory notes, as it has been decided that the relations and rights between the creditor and surety are the same as in cases where the suretyship is created by agreement or guaranty; and the promissory notes, it will be observed, are payable to the plaintiffs, creating therefore a direct and immediate privity. I am not aware that either the text books or the decisions distinctly define the extent of the obligation and responsibility which rest upon the creditor in regard to the surety being made acquainted with all the material circumstances connected with the transactions to which the suretyship is to be applied. The cases which are reported have generally arisen out of transactions in which there has been personal communication between the creditor and surety; and the clear law deducible from those decisions is, that the creditor must make a full, fair and honest communication of every circumstance calculated to influence the discretion of the surety in entering into the required obligation. Lord *Cranworth*, while sitting as lord commissioner, well observed, that the duty of the creditor in regard to the communication to be made to the surety, assimilated that of the assured in a policy of insurance, who, unasked, is bound to give to the underwriter all the information in his power to enable him to estimate the character of the risk he is invited to undertake.

"Where communication does not take place between the creditor and the surety, the duty of the creditor cannot be better illustrated than by the case of the assured; but, in the case of an insurance, communication necessarily takes place between the assured, or his agent, which is the same thing, and the insurer; but such communication does not always take place between the creditor and the surety. The question arises, whether the party through whose instrumentality the guaranty or suretyship obligation is created, is to be considered as the agent of the creditor, the party to be insured, and therefore affecting the principal; or if not, how far the validity of the security is affected, if it shall have been obtained by fraud or by misrepresentation or suppression; or, in other words, does a creditor entirely escape responsibility by desiring his debtor or party contracting with him to procure the suretyship contract—the creditor declining, or, at all events, abstaining from communication with the surety? In this case the bill contains no statement leading to the conclusion that any communication took place between the plaintiffs and defendant, except that, in regard to some of the bills, it is alleged that they were delivered or deposited by the defendant and *Bowers* with the plaintiffs. The answer contains no statement of any communication between the plaintiffs and defendant, beyond the allegation that the defendant was once or twice at the banking house, and that the managing clerk frequently visited her. It does not set forth what took place upon any of those occasions affirmatively; but it expressly denies that she was ever informed of *Bowers* being indebted to the plaintiffs, or that any application was ever made to her until 1849 upon the subject of the notes or bills, or of the debt owing to the plaintiffs. In *Re Pidcock* v. *Bishop*, 3 B. & Cr. 605, there does not appear to have been any communication between the creditor and the surety; and in that case the guaranty was held to be void, in consequence of the debtor having forborne to inform a surety of a condition in the contract between the creditor and the debtor, for the performance of which the surety became bound. The case of *Pidcock* v. *Bishop* was a distinct decision; but there is an *obiter dictum* of a different import in *Stone* v. *Crompter*, 5 Bing. N. C. 142. In that case the suretyship contract was held void by reason of an alleged misrepresentation by the creditor to the surety, through his agent. But in the course of the judgment, Tindal, C. J., said that 'a creditor was not responsible for the misrepresentation or non-communication of material circumstances by the debtor, where there is no communication between the creditor and the surety." The present occasion does not call for the expression of an opinion upon this important question; and, before the hearing,

the case may be relieved of the question by the evidence which may be given in the cause. It is enough, therefore, to say, at present, that the facts as they now stand, present a strong probability that the defendant was induced to undertake the responsibility sought to be enforced against her by misrepresentations or suppression of the important circumstances in the case; and if that fact shall remain unaltered, a very serious question as to the legal effect of such fact upon the validity of the securities must arise at the hearing."

As to the obligation of the Bank to warrant the existence of the debts sold by it, it is only necessary to refer to the Article — of the Civil Code, and to the cases above cited, to show that defendants can avail themselves of this plea, and to state that the evidence shows a large amount of the claims had no existence, and a large amount belonged to third persons; if the defendants are then liable at all, the plaintiffs must make good to them the amount of these obligations, or show such title in themselves as will enable defendants to recover them back from those who have unjustly received them, if they were really the property of the Bank and by it sold to *Marchais.*

III. As to the third point, that the Bank had imposed an additianal obligation upon *Marchais,* not warranted by the contract with defendants, they cite the case of *Bowan* v. *McDonald,* vol. I, part 1st, pp. 7 and 8 of Little & Brown's English Reports (from 14 Jurist. 1077.) In this case one *Bird* was appointed teller of the Edinburgh and Leith Bank, and gave bond as such for the faithful discharge of his duties. Subsequently he was appointed agent for a branch in Dalkeith, and the sureties consented to remain bound for him in this new capacity. At a still later period, the Bank agreed to raise his salary on condition that he should be liable for one-fourth of the losses of the branch sustained by discounts. The Bank requested *Bird* to again give new bonds, but it was not done—and, on sustaining loss by the misconduct of *Bird,* not growing out of discounts, but from his permitting a customer to overdraw his account, it was held by the House of Lords, on the advice of Lord *Brougham,* that the surety of *Bird* was discharged by this addition to the contract between *Bird* and the Bank. In the case of *Miller* v. *Steuart,* 9th Wheaton, 703, the same principle was decided by the Supreme Court of the United States.

In that case *Ustick* had been appointed collector of excise duties in a number of counties in New Jersey, and gave bond as such; subsequently, he was appointed collector for another county, and the securities were declared not liable for the taxes collected in the counties for which they had agreed to bind themselves, because, say the court, they have the right to stand upon the very letter of their contract.

The same is declared by the Supreme Court of this State in the case of *McGuire* v *Wooldridge,* 6th R. Reps., p. 47.

Before concluding, it is necessary to notice two decisions relied on by the plaintiffs, to wit: that of *Villeré* v. *Armstrong,* 4 N. S. p. 21, and that of *The Mayor* v. *Blache* et al., 5 L. R. 500. The broad declaration contained in the first of these cases, that the sureties can make no objection to the validity of the contract, that the principal could not make, clearly, cannot be sustained; or else, in this case, if it had been shown that the Bank was perfectly aware of the default of *Marchais,* and had used every artifice to cover this default up from the securities, and induce them to sign, they would be unable to defend themselves against the most intolerable fraud.

To the more limited declaration in the case of *The Mayor* v. *Blache,* that the obligation being valid as to the principal, the securities cannot avoid the responsibility incurred without showing that they were deceived and induced to enter into the contract by devices practised on them, with that intention, several answers may be made.

1st. That it does not say by whom those devices must have been practiced; and if devices of the principal debtor, suffice why here they are shown.

2d. That the Court, in looking at the case before them, give utterance to a general principle which is a correct decision of the case before them, but, if extended to all others, is erroneous : as in this general allegation they have overlooked all cases of error, between which, where the error relates to a material part of the contract and fraud, the law makes no distinction. Take for example this case : suppose that *Marchais,* instead of being an agent for buying notes, had been a general agent for buying and selling slaves, and that he had represented himself as having bought for the Bank sixty slaves, naming them and being actually in possession of that number of slaves, he had proposed to

the Bank to buy them all and give the joint and general notes of himself and the present defendants for the price of them—the Bank retaining no mortgage on them; the Bank having furnished funds to buy that number of slaves, and believing *Marchais'* statement that the sixty slaves in his possession are their property, accept the offer; that on application to defendants, however, they refuse to endorse the notes unless a mortgage be reserved to secure them, and the sale s so passed.

Then there would be no doubt as to what induced defendants to become sureties.

Now, suppose that *Marchais* is sued for these slaves, and the title to the whole of them proves to be in other persons, who had confided them to him to be hired out in Louisiana. He would then have been perfectly aware that the slaves were not the property of the Bank, and cannot complain, perhaps, of his own act. The Bank would have been acting in error, as well as the securities. Can not the sureties plead that error and the liability of the Bank to subrogate them to their mortgage on the slaves sold. Surely the opposite opinion cannot for a moment be tolerated. Yet there is no difference except in the nature of the surety in the two cases.

3d. Can it in any proper sense be said that the contract to which we are sureties here is a valid one, even between the Bank and *Marchais*? True, *Marchais* owes them the amount of money for which he gave his notes, but does he owe it because of his purchase of the assets of the Bank? Undoubtedly not; and with the proof on record in this case, the Bank could not recover against him— if the purchase had been made in error, instead of to hide his own fraud and embezzlement.

The right of the Bank to recover against *Marchais* is not derived from their contract of sale to which alone defendants are sureties, but from his previous embezzlement of their funds, and all that prevents *Marchais* from availing himself of this defence is the maxim that no man can plead his own crime as a defence. But his securities labor under no such disability.

The contract in reality beween *Marchais* and the Bank was not a sale. It was an attempt, under the disguise of a sale, to cover up his (*Marchais'*) default; and, though the Bank were laboring under an error, and believed they were selling their own property when they were only getting notes for the amount for which their cashier was a defaulter, as the sureties labored under the same error, there was no mutual consent to the real transaction, and the whole is void.

4th. If the Court of this State did mean to go the extent contended for by the plaintiffs in the two cases cited, their opinion is in direct conflict with the decisions of the Supreme Court of the United States, and the highest courts of law and equity in England, as well as with reason and justice.

The judgment of the Court was pronounced by

OGDEN J. The defendants are sued by the Bank, as the securities of *P. Marchais*, on certain notes executed by *Marchais* and the defendants, jointly and severally, payable to the order of the plaintiffs, the consideration of which notes was the price of a banking house and lot with a large amount of bonds, bills and notes, the assets of the Branch Bank at Thibodeaux, sold by the Bank to *Marchais*. The answer of the defendants contains a charge of fraud on the part of the Bank in the concealment of material facts from the defendants, which, if known to them at the time of their signing the notes, would have prevented their incurring the responsibility for which they are now sought to be made liable. That charge, however, is entirely unsupported by any evidence in the record, and no attempt has been made to sustain it in the argument of the defendants' counsel before the Court. The principal ground of defence which has been relied on, is that the obligation contracted by the defendants as sureties of *Marchais*, was entered into through error both on the part of the defendants and of the Bank, in whose favor it was contracted. The material facts which seem to be undisputed and to haveformed the basis of the argument on both sides are these: *Prosper Marchais*, the principal in the

notes, was the cashier of the Branch of the Union Bank at Thibodaux. Pre-vious to the 23d of November, 1849, he had become a defaulter, having em-bezzled a large amount of assets belonging to the Bank. In order to prevent the discovery of his acts, which were unknown to the Bank, who reposed an unlimited degree of confidence in him, he proposed to them by a letter dated the 23d of November, 1849, to purchase the Banking house and all the assets of the Branch at Thibodeaux, and to give his notes at one, two, three, and four years, endorsed by five good names of planters in the parishes of Lafourche and Terrebonne, and the defendants, in this suit, are named as the endorsers he proposes to give. On the 1st of February, 1850, the Bank adopted a resolution accepting in substance the proposition of *Marchais*—the resolution contains the following clause : " This sale is made on the following terms and conditions, viz : " For the real estate said *Marchais* is to give four notes drawn by him as principal, and *J. A. Scuddy, J. C. Beatty, L. Bush, H. M. Thibodeaux* and *L. Barras,* as securities *in solido,* for $1,500 each, and payable respectively on the first of March, 1851, 1852, 1853 and 1854, with four per cent. per annum from the 1st of March, 1850, until their maturity, and seven per cent. per annum from maturity until paid. 2. For the notes, bonds &c. said *Marchais* to give four notes drawn as aforesaid of $16,000, each pay-able in the Union Bank of Louisiana, in New Orleans, respectively on the 1st of March, 1851, 1852, 1853 and 1854, with interest as aforesaid, and the bal-ance of the amount over and above $64,000, to be paid by said *Marchais* in cash on the 1st March, 1850. On the 16th February, Mr. *Frey,* the cashier of the mother Bank at New Orleans, enclosed a copy of these resolutions to Mr. *Marchais,* and in his letter requests an exact statement to be sent to him of the bonds and notes remaining unpaid on the 1st inst. in order that he might prepare everything necessary. In this letter Mr. *Frey,* remarks that he finds the form of the notes in order, but suggests some slight change. On the 7th of March, 1850 the Banking house and lot, by a separate notarial act, was transferred to *Marchais,* and on the 11th of March, 1850, the President and Cashier at New Orleans, executed a transfer to him of the assets ; and the notes of *Marchais* with the defendants as securities, were received in payment, in accordance with the agreement and understanding between *Marchais* and the Bank, as evidenced by the written proposal of the one and acceptance of the other through the resolution of the Board of Directors. A detailed state-ment is made in the Act of sale of the assets, amounting in the aggregate to $83,783 13, from which is deducted in gross $3,754 49, stated as an allowance for estimated losses, leaving a balance of $80,028 64, of which $16,025 64 was acknowledged to have been paid in cash, and for the balance of $64,000, four notes were given as above stated. Of the bonds, bills and notes enume-rated and described in the act of sale, *Marchais* had, previous to the negotia-tions with the Bank, embezzled a large portion, and a large amount of the notes were not the property of the Bank, and not in their possession at the time of the sale. *Marchais* afterwards absconded, and it was not known until then that he had committed the acts of embezzlement which it is evident the foregoing negotiation and sale consequent thereon, were designed by him to con-ceal until he could either retrieve his fortunes or make arrangements to leave the country.

Under this state of facts the question is presented whether the defendants can be made liable to the Bank, either in whole or in part. As the Bank

UNION BANK
    v.
BEATTY.

had sustained the loss of their assets by the embezzlement of their Cashier, previous to the contract being entered into between them and ·Marchais, it would seem to be very evident that if the securities are held liable, it will not be for an obligation arising out of the contract of sale between Marchais and the Bank, but for a loss sustained by the Bank previous to the contract being made, and unknown at the time either to the Bank or the sureties—and if, in point of fact, in the understanding of both the Bank and the defendants, the defendants only intended, when they signed the notes, to become securities for Marchais for his faithful performance of an obligation arising out of the particular contract of sale, it would be clearly inequitable to extend the obligation of the sureties beyond that contract, and to render them liable for a loss previously sustained by the Bank and for which the defendants had never bound themselves as sureties. Pothier, in his treatise on obligations, vol. 1st p. 237, lays down this principle, " Quelque étendu et général que soit le cautionnement, il ne s'étend qu'aux obligations qui naissent du contrat même pour lequel la caution s'est obligée, et non pas á celles qui naitraient d'une cause etrangère." It is therefore, undoubtedly, a principle of law as well as of equity, that the contract of suretyship cannot be extended to any obligation that does not spring from the contract itself. The Art. 3008 of the Civil Code, declares that suretyship is to be restrained within the limits intended by the contract. The defence set up embraces other points, but the case turns on the question whether the defendants as sureties of Marchais, can avail themselves of the plea of error and want of consideration. That the Bank believed they were selling to Marchais bills and notes then belonging to them, and that the defendants became the sureties of Marchais on the notes given for the price under the belief that Marchais was then acquiring from the Bank a title to valuable assets, and that both the Bank and the defendants were in error, is a matter about which there can be no doubt. It is equally certain that if the transaction is to be regarded in the light of a contract between the sureties and the Bank, as well as between Marchais and the Bank, the error must be considered as existing on a point which was a principal cause for making the contract and which, according to Article 1817 of the Civil Code, would have the effect of invalidating it. It was, probably, in that view of what may be considered the question on which the case entirely depends, that the counsel for the plaintiffs by a very able argument have endeavored to establish that there was no privity of contract whatever, between the defendants as sureties, and the Bank. It is argued by them that the law supposes the contract of mandate to intervene between the debtor and the surety, and that consequently the suretyship must be considered as having been contracted at the instance of the debtor to which the creditor is not supposed to be privy. These principles and the authorities relied on to support them, cannot reasonably have a greater extent than this,—that no such privity will be presumed to exist, when, from the nature and form of the contract it is not necessarily implied : but does it follow that the surety has not the right of proving that such privity did exist? We think it does not follow, although suretyship may be regarded as an unilateral contract, like all other contracts it may be avoided for error where it is established that there was a direct privity between the creditor and the surety. It is contended that in this case there was no such privity, because the defendants never sought and never had any communication with the Bank, but entrusted the negotiations and execution of the entire transaction to their princi-

pal. The resolution of the Board of Directors in which the defendants were specially named as the sureties they were willing to receive, preceded the execution of the notes; the inference is irresistible that these resolutions were previously communicated to the defendants. After that, it appears to us, if *Marchais* had offered these notes executed in exact conformity with the resolutions of the Bank, for any different purpose, than the one thus contemplated by the parties, the Bank would have had no right to receive them, and yet if in reality there was no privity between the Bank and the defendants in the transaction, they would have had a perfect right to receive them from *Marchais* for any purpose whatever and even to make good his deficit to the Bank, if it had been discovered before the transaction was closed. It would have been a fraud on the part of the Bank if they had, under the circumstances, received the notes of *Marchais*, with the defendants as sureties, knowing at the time the objects of the sale, for the price of which the notes were given, were not in existence, and to render the sureties liable when the Bank did not know that which they ought to have known, and when that did not in reality exist, the existence of which by the very act of sale itself they warranted, cannot be sustained on principles of either law or equity. There was no sale because an object as well as a price is essential to the contract of sale—there was, therefore, no obligation to which the accessory obligation could attach. Ponsot Traité du Cautionnement, p. 44, says, "Il peut arriver que la nullité qui frappe le contrat principal le frappe de telle sorte, qu'il soit impuissant à produire aucune obligation directement ni indirectement, et alors il n'y aura point de cautionnement possible, puisqu'on ne trouve point d'obligation principale qui puisse lui servir de base." The contract of sale in this case was affected by a radical and absolute nullity, and produced no obligation whatever—and this defence of the sureties is independent of the ground of error as to the motives which determined their wills in entering into the contract of suretyship. The plea of error relates to the obligation of the sureties as between the Bank and the defendants, and distinct from the obligation of the principals. The same author just referred to at p. 365, recognizes the obligation of the principals and the sureties as distinct, he says, "par sa nature, le cautionnement est essentiellement un contrat accessoire, et toutefois, nous l'avons .vu s'il ne peut exister sans un contrat principal auquel il se rattache, il n'en est pas moins distinct de ce contrat, soit par sa forme, soit par sa cause, il n'en a pas moins ses conditions propres d'existence." There is no sound reason why all the essential conditions to the validity of the contract as between the sureties and the creditors should not be required to give it legal force and effect, which are required as between the debtor and the creditor. We think it is sufficiently established by the nature of the contract itself, and by the previous negotiations that there was a direct privity of contract between the Bank and the sureties of *Marchais*. From the nature of the contract which was a transfer of debts, rights and claims due to the Bank, a warranty existed in favor of the sureties as well as of their principal that such debts and rights existed. This, of itself, necessarily established a privity between the Bank and the defendants.

The defendants are, therefore, entitled to avail themselves of the plea of error, unless they are debarred from making this defence on the ground as is contended that no defence can be set up by the sureties, which the principal is estopped from making. *Marchais* would be estopped from pleading error or want of consideration by reason of his previous acts of fraud and embezzlement.

It is undoubtedly true that the securities could not set up this defence, if it was based alone upon the fraud which their principal practiced upon them, but it is based also upon error of facts, and that error was a common error both to the Bank and themselves, and induced by the acts of the bank, as well as of *Marchais.* There was in reality no sale when the Bank and the defendants both believed there had been one, and consequently there never existed an obligation on the part of the sureties as regards the price of the assets erroneously supposed to have been sold. The cases of *Villeré* v. *Armstrong*, 4 M., p. 21, and *Mayor et al.* v. *Blache et al.*, 6 L. R., 510, relied on by plaintiff's counsel, are not analogous in principle, and the decisions in these cases do not conflict with the right claimed by the defendants in this case to set up the plea of error. In *Villeré* v. *Armstrong* the securities of the Sheriff on his bond for the collection of taxes set up the plea that the Sheriff had not paid the taxes he had collected the preceding year, and ought not to have been permitted to renew his bond, and it was held properly that such an objection could not be received from the Sheriff himself, and that the sureties could have no defence to the validity of the contract which the Sheriff had not. It could not have been the intention of the court to do more than bring that particular case within the general rule applicable to the case of a valid subsisting contract. It cannot be considered as authority for saying that where there is a privity of contract between the creditor and the surety, and it is shown both parties acted in error, the plea would not be a good one. The decision in the other case, of the *Mayor et al.* v. *Blache et al.*, referred to, does not appear to involve the question which arises in the case at bar. The securities in that case, who were sued as endorsers of *C. L. Blache*, the Treasurer of the city, were also securities on his official bond, and the court say "if the original bond was valid, we are of opinion that the plea of error cannot be sustained in relation to the note sued on." It is to be inferred from the argument of counsel, and the expressions contained in the opinion delivered by the court, that if there had been error affecting the substance of the contract, the sureties would have been relieved. As it does not appear that the securities on the notes in this case were also the official securities of *Marchais*, the principle does not apply, and in neither of those cases, nor in any case to which we have been referred, has it been decided that the sureties may not avail themselves of a defence which is founded in the nullity of the contract as between themselves and the creditor, from whatever cause it arises. The law and the equity which ought to govern this case we consider to be in perfect harmony, and that the defendants are entitled to be relieved from their obligations as sureties in the contract of sale.

We do not consider the parties as disputing their liability on the notes for the banking house.

It is therefore ordered, adjudged and decreed that the judgment of the court below be affirmed, with costs.

SLIDELL, C. J., separate opinion. The defendants are not concluded by the mere form of the instruments by which they have become securities. The notes still remaining in the hands of the payees, the consideration upon which they were given, and the circumstances under which the defendants were induced to enter into them, are legitimate subjects of investigation in the present action.

Although there is no direct evidence that the resolution of the Bank and the purpose of the notes was communicated by any one to the sureties, yet from all the circumstances proved we are all fully convinced, and therefore assume that

the four notes were signed by the defendants with the understanding and inten- <span style="float:right">Union Bank<br>v.<br>Beatty.</span>
tion on their part that they should be used by *Marchais* with the Bank to buy
the assets, and that the Bank in receiving the signatures of the sureties con-
sidered them at the time as given by the suret'es in pursuance of such intention
and understanding.

The transaction then stands on the same footing as though the sale by the
Bank, and the promise by *Marchais*, and the defendants as his sureties, to pay
the price, were embodied in one instrument.

In this view of the contract, which is the only true and practical light in which
it can be considered, we are to say whether the Bank can hold the sureties on
their collateral undertaking to fulfil the promise of *Marchais* in case of his de-
fault.

It is true that *Marchais* could not successfully resist an action on these notes.
He would not be permitted to allege his own turpitude. The principal obliga-
tions is binding on him, because his fraud 'estops him from disputing it; but if
there be an invalidity in the collateral obligation, which is a distinct contract su-
peradded to the principal obligation, the sureties may be discharged.

This invalidity we find in the error of the sureties in entering into the col-
lateral promise. They believed they were becoming the sureties of *Marchais* in
a contract of sale. The supposed nature of the transaction materially concerned
their ultimate responsibility and risk. Acting with the usual foresight of men
in the ordinary course of business, they might well suppose that the assets sold
would afford a fund which would enable their principal to defray, or at least ma-
terially aid him in defraying, the debt for which they were making themselves col-
laterally responsible. As a contract of sale it would also involve, as a legal incident,
the vendor's privilege on the property sold, to which privilege, in case of payment
by them, they would be legally subrogated. Under such circumstances they
might well be willing to assist *Marchais* in effecting the purchase by adding
their guaranty, while, on the other hand, without such features in the contract
to lessen their probable risk, they might have refused to peril their fortunes.
But in supposing the existence of these material circumstances and qualities of
the contract, upon which belief we are compelled by the evidence to believe their
consent was predicated, they were in error, and at the same time the Bank, which
knew the defendants were binding themselves upon that belief, was also in error.
The consent, then, of the sureties was given in error, and received in error. The
sureties having thus consented in error, have in legal contemplation never con-
sented to pay these notes. What alone they consented to pay was the price of
what the bank represented as a sale to *Marchais*, and what the sureties believed
to be a sale to him, which sale was not in fact made, because the thing profes-
sedly sold did not exist,

I therefore concur with my brethren in the opinion that the judgment should
be affirmed.